## No. 39,334

COLUMBIAN FUEL CORPORATION, a corporation, *Appellant*, v. PAN-
HANDLE EASTERN PIPE LINE COMPANY, *Appellee* and *Cross-appel-
lant.*

(271 P. 2d 773)

Opinion filed June 12, 1954.

*H. W. Stubbs* and *W. P. Wesley*, both of Ulysses, argued the cause and were on the briefs for the appellant.

*Mark H. Adams,* of Wichita, argued the cause, and *Charles E. Jones, Wm. I. Robinson, J. Ashford Manka, Clifford L. Malone,* all of Wichita, and *Edw. H. Lange,* of Kansas City, Mo., were with him on the briefs for the appellee and cross-appellant.

*Conrad C. Mount, O. R. Stites,* and *Joe Rolston,* all of Oklahoma City, Okla., *Clayton E. Kline* and *M. F. Cosgrove,* both of Topeka, and *A. E. Kramer* and *Bernard E. Nordling,* of Hugoton, were on the briefs *amicus curiae.*

The opinion of the court was delivered by

WEDELL, J.: The plaintiff, Columbian Fuel Corporation, a producer of natural gas in the Kansas portion of the Hugoton gas field, sought recovery of a money judgment from the defendant, Panhandle Eastern Pipe Line Company, a corporation, a purchaser of gas.

The action has not been tried. The district court conducted a pretrial conference pursuant to G. S. 1949, 60-2705 and 60-2902 in order to determine questions of law based on issues joined by the pleadings, which included numerous exhibits, and stipulations of fact.

The second amended petition comprised four causes of action. The parties had executed two contracts for the sale and purchase of gas, one in 1937 and the other in 1946. The first two causes of action involved those contracts and the impact thereon by orders of the Kansas Corporation Commission. The general nature of those two causes of action is the same. Both involve the same principal question, namely, whether plaintiff is entitled to receive payment from defendant for the cost of gathering the gas from plaintiff's wells in the field and for its delivery to defendant's pipe line at a point designated in the contracts. Plaintiff claimed one cent per thousand cubic feet (MFC) of gas was a fair and reasonable price for the cost of gathering and delivering the gas. It also claimed interest thereon at the rate of six percent per annum from the respective monthly dates on which payment for the sale of gas was due under the contracts. Plaintiff alleged such interest should be paid from March 1, 1949, the effective date of the commission's interim order dated February 18, 1949, under which the value of gas was fixed at a minimum of not less than eight cents at the wellhead, contrary to the price designated in the contracts. Defendant contended plaintiff was not entitled to recover anything under either of those two causes of action. The court ruled in favor of plaintiff on each of them, except as to the interest claimed.

In the third and fourth causes of action plaintiff sought recovery of interest on sums of money claimed, which sums were the difference between the price, under the two contracts, and the increased

price fixed by the interim order of the commission. Payment of the increased amounts were withheld by permission of the commission pursuant to defendant's filing a bond which the commission approved. On those two causes of action the court concluded defendant should prevail.

Each party has appealed from portions of the judgment adverse to it.

In order to avoid confusion and in the interest of brevity we shall refer to plaintiff as the seller and to defendant as the buyer. Those terms harmonize with the terms employed in the contracts to which we shall later refer. We shall continue to refer to the Kansas Corporation Commission as the commission.

The pleadings, admissions and the exhibits are voluminous. We shall presently refer only to portions thereof which are of general importance and shall later refer, where necessary, to other provisions relied upon by the parties. .

The 1937 contract fixed the price at four cents per MCF of gas. It stated the point at which the seller was to deliver the gas into the buyer's line, where the buyer was required to install a meter at its expense. That point was the northeast corner of section twenty-four (24), township twenty-nine (29), range thirty-six (36), Grant county. It required the seller, at its own cost and expense, to lay and maintain the necessary gathering lines in the field and also the delivery line to the meter. It provided the point of delivery into the buyer's line should be the point at which the gas was to be sold and delivered. It also provided:

"This contract is expressly made subject to present and future valid statutes, orders, rules, and regulations of duly constituted authorities having jurisdiction over either or both Seller and Buyer . . ."

The 1946 contract fixed the price at five cents per MCF. In all other respects it contained the same material provisions as those found in the 1937 contract.

The commission's basic proration order for the Hugoton gas field promulgated under date of March 21, 1944, contained the following provision:

"i. That the producers in the field have been required, by custom, to lay gathering lines from their wells to the pipe lines of the purchasers. A lease is, therefore, undeveloped until a gas-producing well has been completed thereon and the owner or operator thereof has tendered gas to a purchaser at the purchaser's pipe line. Before a well is entitled to an allowable, the

owner or operator thereof should either tender the gas for sale at the prevailing price being paid in the field to a pipeline company or others who are purchasing in the field in which such a well is located, or demonstrate that he will and can produce the gas allowed such a well for lawful purposes."

On February 18, 1949, the commission, upon application of certain royalty owners in the Hugoton gas field, and others, made an interim order in which it fixed the value of gas at the wellhead in that field. The instant buyer, together with others, intervened. That hearing was given Docket No. 35,154-C (C-1868). In the course of the hearing the commission concluded the proceeding did not fully explore all the factors which the commission deemed necessary to consider in arriving at a final determination as to the value of gas at the wellhead in such field or as to what minimum wellhead price should be fixed for the sale of natural gas. It, therefore, entered an order instituting a further investigation under Docket No. C-164. It did, however, conclude that under the undisputed evidence adduced it was established that in order to give effect to all the intents and purposes of the statutes relating to production and conservation of natural gas it was necessary and appropriate to determine, pending completion of the investigation, what the fair and reasonable value of natural gas at the wellhead was in the Hugoton field. It, therefore, ordered:

"1. No person, firm or corporation taking gas from the Hugoton Field shall take or cause such gas to be taken out of the producing structures or formations thereof without attributing thereto for purposes of payment to the producers, landowners, leaseowners and royalty owners a fair and reasonable value at the wellhead of not less than eight cents per thousand cubic feet."

The foregoing order was made effective from and after March 1, 1949, and until further order. The commission stated its determination of the value of gas might be modified as a result of further investigation. It, however, provided that pending completion of its investigation payment of the difference between the contract price of gas and that presently fixed by the commission should be made as follows:

"(a) Make actual payments of such differences at the usual time payments are made to the producers, leaseholders, landowners and royalty owners entitled thereto, or

"(b) Deposit and impound in their own treasuries the actual amounts representing such differences and hold such funds in trust for the use and benefit of such producers, leaseholders, landowners and royalty owners, pending final determination and completion of the investigation instituted in Docket No. C-164 and the further order of this Commission, or

"(c) Furnish a bond, with good and sufficient surety, in an amount adequate to insure payment of all such differences upon final determination and completion of the investigation instituted in Docket No. C-164, running in favor of the State Corporation Commission of the State of Kansas for and on behalf of such producers, leaseholders, landowners and royalty owners."

It also provided that the buyers should keep full record of their payments or deposits, if made in accordance with the above order, and should make monthly reports to the commission of the amount of gas purchased, to whom payments were made and the amounts thereof. The instant buyer elected to file a bond which the commission approved.

Thereafter the buyer instituted a proceeding in the district court of Seward county *for a review of the interim order* dated February 18, 1949, in the district court of Seward county. Other buyers instituted like proceedings in the district court of Finney county in all of which review proceedings the interim order of the commission was affirmed by the respective district courts. Three appeals were consolidated in this court. It affirmed the decisions of the district courts in an opinion filed October 7, 1950. (*Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 169 Kan. 722, 222 P. 2d 704.) On January 6, 1951, this court filed a second opinion and denied the motion for rehearing. (*Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 170 Kan. 341, 225 P. 2d 1054.)

Following the last opinion and on February 21, 1951, the commission, on its own motion, gave further consideration to the matter, reviewed its former orders, took cognizance of the decisions of this court, stated the matter had become finally determined and that distribution should be made to the sellers of gas for the differences in price between that fixed by contracts existing prior to March 1, 1949, and the interim order of February 18, 1949.

It will be recalled the commission in its interim order granted the buyer three alternatives, previously quoted, for the adjustment of such differences. It specifically stated in its order of February 21, 1951, that alternatives (b) and (c) set forth in the interim order were inserted to make payments of such differences unnecessary until after the lawfulness and reasonableness of its interim order had been judicially determined. It then, on February 21, 1951, provided the differences should be paid on or before April 1, 1951. It restated its order for change of price to eight cents. The buyer

paid the difference before the specified date. Its February 21, 1951, order further stated:

"The purpose of the Interim Order of February 18, 1949, is to accomplish conservation and prevention of waste of gas in and from the Hugoton Field."

On the following March 8, 1951, the commission, on its own motion, reconsidered its order of February 21, 1951, and found it had omitted language therein which was essential to the expression of its order when made. It corrected the order to make it read:

"2. That all persons, firms or corporations which have taken gas or caused gas to be taken from the Kansas Hugoton Field since March 1, 1949, or which are taking or causing gas to be taken from said field shall from and after March 1, 1949, attribute to all gas taken, (except gas for the operation of leases), for all purposes, including the payment to producers, landowners, lease owners and royalty owners, the fair and reasonable *minimum* value of *not less than* eight (8¢) cents per thousand cubic feet at the wellhead until the further order of the Commission in the investigation instituted in Docket No. C-164."

The italicized words constituted the only additions or corrections. It will be noticed the corrected order corresponds entirely with the interim order made February 18, 1949, heretofore quoted, except that the word "minimum" was inserted in the last order.

On May 4, 1951, the commission's order stated: Its investigation in Docket No. C-164 was closed on May 2, 1951; the buyer in the instant case had fully complied with its order for the payment of differences within the time required and the buyer's bond should be and was cancelled and returned to it.

On February 28, 1952, the seller filed the instant action against the buyer in the district court of Grant county. On January 7, 1953, it filed its second amended petition here involved. It set forth the amount it had invested in the construction of gathering and delivery lines; alleged one cent per MCF of gas was a fair and reasonable charge for the cost thereof and sought recovery in that amount together with interest heretofore mentioned. The final pleadings of the parties consisting of the second amended petition, answer and reply and the stipulations of fact embraced all matters previously narrated herein.

The district court concluded the determination of the issues in the case depended upon the interpretation of the interim order of February 18, 1949, and the final order of February 21, 1951. It found the primary purpose of the interim order was the conservation of the natural product, gas; the fixing of the value of gas at the wellhead at eight cents was a conservation measure; the contracts

were subject to the jurisdiction of the commission and were changed by its order so as to entitle the seller to *eight cents net at the wellhead;* it was the court's duty to construe the contracts in the light of the commission's order so as to carry out the expressed intentions of the commission and beyond that the contracts should and do control; the seller was entitled to a refund, but without profit to it, of the cost incurred in gathering and delivering gas to the point specified in the contracts but was not entitled to recover interest on the first or second cause of action.

In denying recovery of interest on the third and fourth causes of action, it, in substance, found:

An interim order is not a final order and in this case the order increasing the price was expressly left open to modification by the commission; that order could have been vacated in full; the commission fully recognized the contracts could be changed only as a conservation measure in the public interest; the commission recognized an honest difference of opinion existed as to whether it had statutory authority to make its order increasing the price and whether the interim order was constitutional; in permitting the filing of a bond by the buyer to secure payment of the difference in price the commission made no order which required security for interest on any amount which finally might be judicially determined to be due; the commission gave no other indication it intended interest should be charged on the amounts impounded by the buyer or secured by bond; had the commission intended interest should be paid on a conservation order it easily could have so provided.

Our examination of the terms of the bond also discloses the buyer obligated itself to pay only the difference if it was finally determined the interim order was lawful and reasonable. The bond required and approved by the commission did not provide for the payment of interest on such differences. It provided if the conditions set forth in the bond were fully complied with the obligation should be void.

In addition to the foregoing it is well to observe the commission interpreted its own interim order. In so doing it expressly stated it had not intended payment of the differences should be made before the question of the validity of its interim order fixing the value of gas at the wellhead was judicially determined. Moreover after such judicial determination it fixed the definite date for such payment as April 1, 1951. The buyer made payment before that date. The

commission found the buyer had fully performed in accordance with its orders and cancelled the bond.

We have carefully noted the seller's arguments and citation of cases involving its alleged right to collect interest on the differences in price. We need not unduly extend this opinion with an analysis of the numerous cases cited by either party on this subject. The rule that an administrative body's interpretation of its own rules, orders or regulations, in case of ambiguity, is entitled to great weight— some courts say controlling weight—is universally recognized. (*Harrison v. Benefit Society*, 61 Kan. 134, 140, 59 Pac. 266; *Bank v. Reilly*, 97 Kan. 817, 823, 156 Pac. 747.) The original order pertaining to payment of differences must be construed in the light of the commission's final order interpreting its intent. (*Georgia Comm. v. United States*, 283 U. S. 765, 771, 75 L. ed. 1397, 51 S. Ct. 619.) When so read all uncertainty of its intent is removed. An interpretation of an administrative order or regulation by the administrative agency becomes of controlling weight and will not be disturbed unless clearly erroneous or inconsistent with the regulation. (*Bowles v. Seminole Rock Co.*, 325 U. S. 410, 89 L. ed. 1700, 65 S. Ct. 1215.)

Here the commission's interpretation of its order for payment of differences was not inconsistent with such order which contained no provision for payment of interest and required no bond to secure the payment of interest.

This is not a case involving the right to recover an unlawful or unauthorized overcharge on transportation rates or a similar case. The sole purpose of the commission's interim value, or price-fixing, order was the conservation of a natural resource and the prevention of its waste. At that time it recognized the questionable validity of its order. It, however, was concerned with exacting necessary security for payment of the differences in price in the event its order was judicially sustained. Its authority to exact such a bond is not an issue. For present purposes we therefore assume it had the right to exact such a bond and to include terms therein which it believed provided ample security for such payment. The bond it exacted and approved did not require the payment of interest on the differences in price.

Furthermore, the commission in its interim order expressly stated such order was not a final order and would be subject to change depending upon what further investigation disclosed. The commission, therefore, had power and authority to change the interim price order at any time. It might have set it aside entirely.

The seller in support of the commission's general authority quite properly lays great stress on the statute, and the same provisions in the contracts, to the effect that all contracts of the parties and orders of the commission are subject to change by it. But by the same reasoning it would seem the commission had power to refuse to exact payment of interest on the differences in price. And by the same token it had authority to clarify its interim order had there been doubt concerning its meaning. Here any possible doubt was completely dispelled by the commission's interpretation of its own order. In view of what has been said it is clear we do not have before us one of the questions raised by the seller, namely, whether interest may be collected from the date of a final order of an administrative agency, board or tribunal where the validity of such order is in doubt but is later established. We think the court properly denied interest on the amounts constituting the differences in price.

There is another reason why the seller cannot complain of the court's judgment denying recovery of interest on the differences in price. That part of the relief sought constitutes a collateral attack on the commission's interpretation of its own order.

The oil and gas conservation act expressly authorizes the commission, on application or on its own motion, to *interpret and enforce* its own rules, orders and regulations *and to determine any right thereunder,* in the manner provided in G. S. 1949, 55-605. (See G. S. 1949, 55-706.) A party, the seller in the instant case, cannot bypass the court of review, ignore the statutory procedure required in such court, and in a collateral and independent action question the validity or the commission's interpretation of its own orders. If an aggrieved party desires to challenge the commission's order, or any part thereof, his remedy is before the commission and under the review statute, G. S. 1949, 55-707. He has that remedy although he may not have been a party to the original proceeding before the commission. (G. S. 1949, 55-606.)

We now return to the first two causes of action in which the court held the seller was entitled to recover the cost of constructing and maintaining the gathering and delivery lines to the point of delivery into the buyer's line designated in the contracts.

The buyer first argues there is no provision in the statutes or in the various orders of the commission authorizing it to fix the price of gas at the wellhead where the point of delivery *is in the field* and

is designated in the contracts. The seller admits the gas is delivered in the field. but contends the particular issue as it pertains to delivery at a point *in the field*, was not presented to or decided by the district court. It is true we do not find the court pinpointed that issue. It, however, clearly appears from the contracts delivery was to be made at a point in the field which was clearly designated. Surely the court did not overlook that obvious fact. We are, therefore, obliged to conclude the order of the district court pertained to a situation where gas was being delivered in the field.

The buyer contends: The basic order of 1944 as amended has not been changed with respect to its provision (i) and that it remains the operative rule of the commission; provision (i) recognizes "producers in the field have been required, by custom, to lay gathering lines from their wells to the pipe lines of the purchasers"; the instant contracts expressly require the seller to construct and maintain such lines at its own expense; although the commission fixed a minimum price of not less than eight cents per MCF at the wellhead it did not expressly alter the provision of the basic order which requires the seller to bear the cost of constructing and maintaining the gathering and delivery lines.

This court is not unmindful of those facts or of the further fact that the contracts provide the sale shall be at the point of delivery described in the contracts. But what was the intention of the commission in the interim order dated February 18, 1949? It is clear to us it intended, as the district court found, that the seller should receive a minimum *net price* of not less than eight cents per MCF at the wellhead. That did not mean at some other point in the field. If the seller, in order to sell its gas, is required to pay the cost of gathering and transporting the gas to the point of delivery designated in the contracts it obviously will not receive a net minimum price of not less than eight cents per MCF at the wellhead. To construe the interim order otherwise is to nullify its practical purpose and intent.

The buyer argues the word "at" contained in the phrase "at the wellhead" is indefinite. We readily concede the word "at" as used in some circumstances has been held to be indefinite. We think, however, the word has a well understood meaning in the oil and gas industry when applied to the wellhead as distinguished from some other point in the field.

The real question, it seems to us, is whether the commission pos-

sessed jurisdiction and power to alter or amend the price terms of a contract in the interest of conservation and elimination of waste, as these terms have come to be understood in the industry. Both contracts provided:

"This contract is expressly made subject to present and future valid statutes, orders, rules, and regulations of duly constituted authorities having jurisdiction over either or both Seller and Buyer. . . ."

In *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission*, 169 Kan. 722, 222 P. 2d 704, involving the instant interim order, as applied to the present and other buyers of gas in the Kansas Hugoton gas field, we held:

"Our statute gives the Corporation Commission authority to make an order fixing a minimum wellhead price for natural gas taken from a common source of supply if the evidence before the Commission justifies its conclusion that such an order is necessary in order to prevent waste and to secure the relative rights of owners of real property from which gas is produced from a common source of supply." (Syl. ¶ 6.)

It is true, as the buyer states, that in the interim order fixing the minimum price of gas at the wellhead the commission made no change in the contracts which require the seller to gather and deliver the gas into the buyer's line at the seller's own expense and said nothing concerning the payment of the cost of that service by the buyer. In view of the fact the interim order did not alter the seller's duty to gather and deliver the gas we must assume the commission intended the seller was to continue to do so. However, under those circumstances the interim price order can be made effective only if the buyer is required to pay the cost of the service. We, therefore, hold the district court did not err in concluding the seller is entitled to recover the cost thereof.

Did the court err in concluding the seller was not entitled to recover interest on the cost of gathering and delivering the gas from the monthly payment dates for gas after the interim order became effective on March 1, 1949?

The seller relies on G. S. 1949, 16-201 which provides creditors shall be allowed to receive interest at the rate of six percent per annum when no other rate of interest is agreed upon. As previously indicated, the interim price order was not a final but a temporary order and the commission expressly so stated. It was subject to change by the commission at any time. It is conceivable the commission ultimately might have made an order requiring the buyer to pay only a certain portion of the cost of gathering and delivering

the gas. Its order might have been set aside entirely. No final principal amount, representing costs, upon which interest properly could be calculated was determined by the interim order.

The instant action does not involve merely a mathematical computation of costs. The question of the buyer's liability for any of the costs was the main issue in the first and second causes of action. The next undetermined question which then existed and now remains is, what is the cost? Is it one cent per MCF as claimed by the seller or is it a smaller amount and if so, what is that amount? What are the various factors to be considered in determining such costs? Whether interest on the cost, under the circumstances of this case, is a proper element of such cost was only one of the unsettled issues.

Under the rule in this state, absent an agreement among the parties, interest is not recoverable as long as those essential factors remain wholly undetermined. (*Prewett v. Van Pelt*, 118 Kan. 571, 575, 235 Pac. 1059; *Govenius Bros. v. Reagor*, 130 Kan. 711, 288 Pac. 537; *Bridgeport Machine Co. v. Hopper*, 134 Kan. 205, 211, 5 P. 2d 832.)

In the Govenius case, *supra*, we held:

"In the absence of an agreement therefor, interest should not be computed on a mutual account, nor on an unliquidated claim." (Syl. ¶ 2.)

It may be conceded there are cases in which interest may be allowed where for all practical purposes the amount due is liquidated for the reason nothing remained except the mathematical process of computing the exact amount due. This is not such a case. See, also, 25 C. J. S., Damages, § 52 b.; 47 C. J. S., Interest, § 19. Neither is this case similar to one involving collection of interest on unlawful overcharges on fixed transportation rates.

It readily is apparent, as the buyer contends, that some difficult and controversial questions will arise in connection with determining the fair and reasonable cost of gathering and delivering the gas. None of the matters mentioned was determined on the date of the interim order of February 18, 1949. They are not yet settled and interest cannot be allowed from March 1, 1949, the effective date of the interim order.

In view of what has been said it follows the judgment of the district court is affirmed in all particulars.