No. 61,377

MERLE D. HICKEY, *et al.*, *Appellants/Cross-Appellees*, v. STATE OF KANSAS, KANSAS CORPORATION COMMISSION, *Appellee/Cross-Appellant*.

(765 P.2d 1108)

Opinion filed December 9, 1988.

*Pantaleon Florez, Jr.*, of Irigonegaray, Eye & Florez, of Topeka, argued the cause and was on the briefs for appellants/cross-appellees.

*Wm. Scott Hesse*, assistant general counsel, argued the cause, and *Frank A. Caro, Jr.*, general counsel, and *Dana A. Bradbury*, assistant general counsel, were with him on the briefs for appellee/cross-appellant.

The opinion of the court was delivered by

HOLMES, J.: This is a class action in which plaintiffs sought additional compensation for hours during which they were assigned to handle telephone inquiries from their homes on behalf of the Kansas Corporation Commission (KCC). Following judgment in the trial court, the plaintiff class filed this appeal and the KCC filed a cross-appeal. We reverse.

The controlling facts are not disputed by the parties. The plaintiff class includes forty petroleum industry regulatory technicians (PIRTs) employed by the KCC, and eight environmental technicians (ETs) employed by the Kansas Department of Health and Environment (KDHE). Effective July 1, 1982, the two state agencies embarked upon an enhanced program for

regulation of the oil and gas industry, as directed by 1982 Senate Bill 498, codified at K.S.A. 55-150 *et seq.* The legislation was adopted to assist in the control and prevention of surface and groundwater pollution. The legislation required the oil and gas industry, among other things, to notify the KCC before setting surface casing on a well, plugging a well, or in case of an accident or emergency which might cause pollution. It also directed the KCC and the KDHE to enter into a comprehensive interagency agreement providing for a management plan designed to integrate field operations for the regulation of oil and gas operations. The resulting agreement and plan became known as the "498 program."

The agencies implemented the program in part by requiring members of the plaintiff class to respond to telephone calls at night, on weekends, and on holidays. Special telephones were installed at the employees' homes for that specific purpose with the costs thereof paid by the state agencies. The employees were assigned to telephone duty on a rotating basis and when on duty were required to maintain a log of all calls received. Generally, plaintiffs provided advice and instructions over the telephone to oil and gas operators on the proper procedures to be followed in the field for the protection of surface and groundwater from pollution. Most of the calls were of a routine nature, but about 5 percent of the calls required an emergency response. When an emergency, such as an oil spill, did occur, the plaintiff taking the call was not to leave home, but was to contact another employee to provide field assistance. About 30,000 calls were handled by the plaintiffs during a total of approximately 80,000 man-hours of home telephone duty during the existence of the 498 program, which was finally terminated in June 1985.

When assigned to home telephone duty, the plaintiffs were required to remain at home where they could be reached by telephone. Other than that restriction, they were free to do whatever they chose so long as they were available to respond to telephone calls. During the existence of the 498 program, the PIRTs and ETs were paid one dollar per hour for each hour of home telephone duty, and generally the ETs were given fifteen minutes compensatory time off for each telephone call actually taken on the assumption that each telephone call required an average of fifteen minutes.

The plaintiff class filed this action on March 22, 1985, seeking overtime compensation at the rate of one and one-half times their regular hourly rate of pay for each hour of home duty telephone time. Plaintiffs, in their original and amended petitions, alleged that the federal Fair Labor Standards Act (F.L.S.A.) applied as well as the Kansas statutes and regulations. Plaintiffs also asserted an additional theory of recovery based upon quantum meruit. Prior to trial, the court, ruled that the F.L.S.A. did not apply, and neither party has appealed from that determination. At oral argument before this court the parties conceded that the F.L.S.A. was not applicable to this action. However, both parties seek to rely upon federal cases and regulations under the F.L.S.A. as persuasive authority for their respective arguments before this court.

Originally this action was filed against both the KCC and the KDHE, but pursuant to additional legislative action the joint responsibility of the KDHE for the 498 program was transferred to the KCC, and the KDHE was therefore dismissed from the case on July 18, 1986. Thereafter, the KCC entered into a partial settlement agreement with plaintiffs, which ensured that the PIRTs received overtime compensation for the time spent responding to telephone calls. Neither party disputes the adequacy of the settlement, and this appeal does not question the rate of compensation to which plaintiffs were entitled for the time actually spent communicating by telephone with oil and gas operators. Essentially, the settlement agreement reflects the parties' agreement that while actually responding to telephone calls from oil and gas operators, plaintiffs were "at work" as contemplated by the Kansas statutes and regulations. The issue in this appeal is whether the plaintiffs were working during those hours they were assigned to wait for telephone calls but were not actually responding to telephone calls on behalf of the State, and if so the appropriate amount of additional compensation, if any, due them.

The case was tried to the bench on September 30 and October 1, 1986. The sole issue at trial was whether any additional compensation was due for time spent waiting, while assigned to telephone duty, but not actually responding to a telephone contact. The plaintiffs' theory was that the restrictions imposed on their activities were so great that they were deprived of the

use of the time for their own purposes, and hence were entitled to overtime compensation for the entire time they were assigned to home telephone duty. In response, the defendant KCC argued that plaintiffs were lawfully compensated pursuant to the regulation on standby compensation, K.A.R. 1-5-26, and that the time spent waiting for calls was not compensable at overtime rates, but rather at the rate of one dollar per hour as set forth in the regulation.

The trial court announced its decision from the bench on October 3, 1986, making numerous findings of fact and conclusions of law. The court held that K.A.R. 1-5-26, dealing with standby compensation, was not applicable to this case. Next, the court noted that K.S.A. 75-5505 and K.A.R. 1-5-24 require compensation at time and a half to State employees "who work more than 40 hours per week." The court then held that plaintiffs performed "compensable work" during *part* of the time they were waiting for calls. Next, the court concluded that 25 percent of the on-call hours should be compensated as "work time" at overtime rates, and that the defendant should receive credit for amounts already paid pursuant to K.A.R. 1-5-26 and the settlement.

The plaintiffs appeal and the defendant cross-appeals. The case was transferred to the Supreme Court pursuant to K.S.A. 20-3018(c). Additional facts will be stated as they become necessary to a determination of this appeal.

While various issues are raised by the appeal and cross-appeal, the determinative issue is whether K.A.R. 1-5-24 or K.A.R. 1-5-26, or neither of them, apply in arriving at the proper compensation to be paid the plaintiffs for their off-hours telephone duty. The trial court found that the compensation due plaintiffs was controlled by K.S.A. 75-5505 and K.A.R. 1-5-24. K.S.A. 75-5505 merely establishes that "[i]t is the policy of the state that a forty-hour workweek shall be the standard workweek of state employees . . ." and then sets forth certain duties of the various state agencies and provides for some variations from the standard forty-hour week. K.A.R. 1-5-24 provides generally, with some exceptions not pertinent here, that employees of the state shall be compensated for *"overtime worked"* at the rate of one and a half times their regular salary rate. The regulation repeatedly

refers to and contemplates *overtime actually worked* by the employee and does not appear to apply to standby time.

K.A.R. 1-5-26 provides:

"(a) An appointing authority may require an employee to be on standby. *Standby time means a period of time outside an employee's regularly scheduled work hours, during which the employee is required, at agency direction, to remain in close proximity to his or her home, and which, for all practical purposes, deprives the employee of unrestricted use of his or her off-duty time.* An employee on standby shall be available at agency direction for immediate recall to perform necessary work. Standby assignments shall be limited to work situations where a probability for emergency recall of employee(s) exists.

(b) *Employees of the state* who are classified as non-exempt employees by public law 89-601, as amended, and employees in agricultural positions, *who receive standby orders shall be compensated at the rate of one dollar ($1.00) per hour for those hours they serve on standby status.*

(c) Employees on standby who are called in to work shall be compensated for the *actual hours worked* at the appropriate rate of pay. They shall not be paid standby compensation for the hours they actually worked. *Only the hours actually worked by the employee shall be credited in determining eligibility for overtime compensation.*

(d) An employee on standby who is not available when called and who does not present reasonable justification for failure to report when called shall lose standby compensation for that standby period.

(e) Standby provisions shall not apply to employees of the state who are classified as exempt employees by public law 89-601, as amended, or to sworn personnel of the highway patrol, or to K.B.I. agents, liquor control investigators, or game protectors. (Authorized by K.S.A. 75-3747; effective May 1, 1979.)" (Emphasis added.)

The trial court specifically found that K.A.R. 1-5-26 did not apply to the present case and was applicable only to emergency situations in which the employee was to be recalled to his or her duty station for emergency duty. We do not construe the regulation as being so limited in its scope.

In considering the applicability of K.A.R. 1-5-24 or K.A.R. 1-5-26, it must be recognized that neither regulation was adopted specifically for the 498 program. Both regulations are general and broad in their scope and were intended to apply to a myriad of situations involving all eligible state employees. K.S.A. 75-3707 grants the Department of Administration broad general powers including in subsection (13) power over personnel matters, pay scales, salary ranges, and related matters. The regulations in question were adopted by the Department of Administration long before the initiation of the 498 program. K.S.A. 55-152 specifically provided that the KCC would adopt the necessary rules and regulations to implement the 498 program,

and comprehensive regulations for that purpose were adopted. See K.A.R. 82-3-100 *et seq.* The record reflects that officials of the KCC inquired of the Secretary of Administration as to the payment for the off-hours telephone duty under the 498 program and were advised that K.A.R. 1-5-26 applied and payment of one dollar per hour was proper. K.A.R. 1-1-1 provides that regulations adopted by the Department of Administration "are intended to provide a uniform, comprehensive, and effective system of personnel administration for the state of Kansas."

In *Hemry v. State Board of Pharmacy,* 232 Kan. 83, 652 P.2d 670 (1982), we held:

"While the courts of this state need not always accept an administrative agency's interpretation of its own regulations, it has long been recognized that in order to insure effectiveness and uniformity an agency's interpretation of its regulations will be given great weight and, in some cases, controlling weight." Syl. ¶ 1.

This has long been the rule in Kansas and apparently is universally recognized. See *Columbian Fuel Corp. v. Panhandle Eastern Pipe Line Co.,* 176 Kan. 433, 271 P.2d 773 (1954). The Department of Administration's interpretation of the applicability of K.A.R. 1-5-26 to the present situation is entitled to great weight, if not actually controlling weight. The reliance of the KCC and the Department upon that interpretation was justified. It appears to us that the KCC was correct in relying upon K.A.R. 1-5-26. The regulation defines standby time as

"a period of time outside an employee's regularly scheduled work hours, during which the employee is required, at agency direction, to remain in close proximity to his or her home, and which, for all practical purposes, deprives the employee of unrestricted use of his or her off-duty time."

While it is true that the regulation appears to have been primarily adopted for emergency situations in which an employee might be called back to the workplace, we do not believe it is limited to such a situation. K.A.R. 1-5-26(b) provides that employees on standby duty shall receive one dollar per hour while subsection (c) provides they will be paid overtime for "[o]nly the hours actually worked." K.A.R. 1-5-24 also makes it abundantly clear that overtime is to be paid only for time actually "worked."

Thus, the real issue in this case is whether the plaintiffs were actually working when they were on standby telephone duty. Both parties rely on federal regulations and cases under the F.L.S.A. as being persuasive for their respective positions that

the time spent waiting for telephone calls was or was not work under our statutes and regulations. As indicated earlier, the F.L.S.A. and the federal regulations implementing it are not controlling in this case, and we see nothing to be gained by an exhaustive review of the federal regulations and decisions. Suffice it to say, there are analogous factual situations which will support either argument. In the final analysis it is for this court to determine whether, under our statutes and regulations, the plaintiffs in this case were working to the extent contemplated by the overtime provisions of the Kansas regulations and statutes.

The trial court recognized that requiring the plaintiffs to remain at home to respond to possible telephone calls from the oil and gas industry constituted a significant imposition upon plaintiffs' free time. The court also recognized that it was unrealistic to say that the plaintiffs were actually working the entire time they were on off-hours telephone duty. The court stated:

"27. The Court holds that a portion of this off-hours phone duty time should be considered work time. In calculating the amount of off-hours phone duty that should be considered work time for compensation, the Court believes that the employment relationship and the duties of the job prior to the new regulations, must be examined. First, much of the time spent on the off-hours phone duty was utilized for personal business such as eating and sleeping. Eating and sleeping, alone, would consume approximately one-half of the overnight off-hours phone duty period of 16 hours. Much of the weekend time could be utilized personally at home entertaining family and friends, watching television and performing chores around the house. Second, a part of the PIRTs' and ETs' job description at all times is that when available, they are to respond to calls from the industry 24 hours per day. This requirement, as stated previously, has always been a part of their duties and responsibilities. Third, the PIRTs and ETs were relieved of their general on-call duties when the "498" schedules were implemented. Finally, while on regular duty, the PIRTs and ETs were required to do other work and were subject to supervision. Off-hours phone duty had no supervision or duties other than to respond to calls and maintain minimum logs and records. The Court finds that setting up a definite schedule for off-hours telephone duty relieved the PIRTs and ETs of the general ongoing obligation to be available when they were not scheduled for the off-hours phone duty. The Court finds that, although there were significant requirements and impositions made upon the PIRTs and ETs related to the off-hours phone duty, it is also true that there were benefits the PIRTs and ETs received from the program, and, hence, they are not entitled to payment for all hours served in the off-hours phone duty."

The court then concluded that 25% of the waiting time should be compensated as worktime.

It appears that the trial court attempted to reach an equitable

resolution of a problem which had no clear solution or guiding precedent. While it is tempting to adopt the trial court's equitable resolution of this matter, we find no factual basis in the record for doing so. In our opinion, the plaintiffs were either working while on home telephone duty and entitled to compensation for the entire time, or they were on standby time and entitled to compensation at the rate of one dollar per hour as contemplated by K.A.R. 1-5-26 and as determined by the Secretary of Administration.

Numerous examples and definitions of the term "work" or "worked" are available. See 46 Words and Phrases, Work, p. 246 *et seq.* (perm. ed. 1970). Black's Law Dictionary 1780 (4th ed. rev. 1968) defines work as:

"To exert one's self for a purpose, to put forth effort for the attainment of an object, to be engaged in the performance of a task, duty, or the like. The term covers all forms of physical or mental exertions, or both combined, for the attainment of some object other than recreation or amusement."

Webster's New Twentieth Century Dictionary 2107 (2d ed. 1956) states the initial definition of the verb "work" as:

"1. to exert oneself in order to do or make something; to do work; to labor; to toil,"

and in defining the word "work" as a noun states the initial definition as:

"bodily or mental effort exerted to do or make something; purposeful activity; labor; toil."

The words "work" and "worked" are common everyday words generally understood by the general population. They contemplate something more than merely waiting for the telephone to ring with no restrictions upon an individual other than being available to answer calls if any are received. We agree the actual answering of the calls, responding to them, and giving advice or other information constituted actual work as contemplated by both K.A.R. 1-5-24 and K.A.R. 1-5-26. However, that time has already been compensated at the appropriate overtime rates as provided by the partial settlement between the parties.

We conclude that K.A.R. 1-5-26 does apply to the plaintiffs in this case. The time spent on home telephone duty by members of the plaintiff class clearly appears to fall within the definition of "stand-by time" set out in subsection (a) of K.A.R. 1-5-26. Plaintiffs attach too much significance to the words "recall" and

"emergency" as used in the regulation. While the plaintiffs were not actually on call to return to their daytime offices, they were on call to perform the same duty on the telephone at home as if recalled to the office to man the telephone. The adoption of the home telephone duty appears to have been an attempt to avoid the necessity of requiring employees to actually be in their offices during nighttime, weekends, and holidays. Considering that the regulation was broadly drawn to apply to numerous situations and all non-exempt state employees, it appears clear that the actual duty of answering the calls was tantamount to a recall to perform the same duties. Further, it appears to us that the last sentence of K.A.R. 1-5-26(a) was intended to prohibit agencies from paying standby compensation unless there is some probability of an emergency situation requiring immediate attention. Here the evidence is clear that approximately 5 percent of all calls received did involve emergencies and thus it cannot be said there was no probability of emergencies in the 498 program. K.A.R. 1-5-26 directs compensation of employees at the appropriate rate of pay for the *actual hours worked.* In this case, the defendant has already compensated plaintiffs at the applicable rate of pay for the time actually spent on the telephone handling state agency business. Thus, the parties have stipulated that the time spent on the telephone did constitute "work." The remaining time was merely standby time and was properly compensated by the defendant at $1.00 per hour.

In view of the result reached, the other issues raised by the parties need not be addressed.

The judgment is reversed.

HERD, J., dissenting: I disagree with the majority opinion. I believe the district court was correct in its finding that K.A.R. 1-5-26 applied only to employees subject to emergency duty. I would construe this to mean highway maintenance personnel, law enforcement officers, and firemen. Those employees' job descriptions include their potential emergency duties. They thus have accepted their employment with that understanding and could be said to have inferentially agreed to it.

Such is not the case here. The plaintiffs are petroleum industry regulatory technicians and environmental technicians. Their jobs are not normally subject to emergency duties. Their job descriptions do not include the extra duties here imposed upon

them. They have not consented to the additional duties. Under these circumstances, when a governmental employer unilaterally imposes standby telephone duties upon an employee for the benefit of the public, the public should pay for that service at a reasonable rate of pay. One dollar per hour is not a reasonable rate of pay.

The majority is requiring plaintiffs to make a donation of their time and services to the public. I would pay plaintiffs time and a half for their overtime, pursuant to K.A.R. 1-5-24.

LOCKETT, J., joins the foregoing dissent.